**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| DERMTECH, INC., *et al.*,[1] | Case No. 24-11378 (JTD) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF BRET CHRISTENSEN, PRESIDENT AND CHIEF EXECUTIVE**
**OFFICER OF THE DEBTORS, IN SUPPORT OF THE**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Bret Christensen, hereby declare under penalty of perjury:

1.      I am the President and Chief Executive Officer of DermTech, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors" or the "Company") in the above-captioned chapter 11 cases. I also serve as a member of the board of directors (the "Board") of Debtor DermTech, Inc.

2.      I have served as the Debtors' President, Chief Executive Officer, and as a director on the Board since May 2023. Prior to joining the Company, I served as the Chief Commercial Officer of Insulet from 2017 to 2023.  Earlier in my career I served as general manager of Preventive Care at Myriad Genetics, Inc. ("Myriad Genetics"), and before joining Myriad Genetics, I held several positions and leadership roles at Hologic, Inc. and Cytyc Corporation.  I hold a Bachelor's of Science in Business Management from Utah Valley University and a Master's in Business Administration from the University of Utah.

3.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition (collectively, the "Petitions") for relief under chapter 11 of title 11 of the United States

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are DermTech, Inc. (0849) and DermTech Operations, Inc. (8997).  The Debtors' service address is 12340 El Camino Real, San Diego, California 92130.

Code, as amended (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (this "<u>Court</u>").   To minimize the potential adverse impact of the commencement of these chapter 11 cases, the Debtors have requested certain "first day" relief in various applications and motions filed with the Court, each of which is listed in Section IV below (collectively, the "<u>First Day Motions</u>").  The First Day Motions seek relief intended to avoid immediate and irreparable harm to the Debtors and to preserve the value of the Debtors' estates by, among other things, paying certain prepetition and administrative obligations to ensure the success of the Debtors' restructuring efforts and obtaining procedural relief that facilitates the Debtors' orderly transition into and emergence from chapter 11.

4.     As a result of my tenure with the Company, review of relevant documents, and discussions with members of the Debtors' management team, counsel, and professionals from AlixPartners LLP ("<u>AlixPartners</u>"), the Debtors' proposed financial advisor, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.  I submit this declaration (the "<u>Declaration</u>") in support of the Petitions and the First Day Motions and to assist the Court and other parties in interest in understanding the Company's corporate history, business operations, and prepetition corporate and capital structure and the circumstances that caused the Debtors to commence these chapter 11 cases.

5.     Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' financial affairs and restructuring initiatives, or my opinions based upon my experience and knowledge.  I am authorized to submit this Declaration on behalf of the Debtors.  If called as

a witness, I could and would testify competently to the statements set forth in this Declaration, as the information in this Declaration is accurate and correct to the best of my knowledge.

## PRELIMINARY STATEMENT

6.      The Debtors are a molecular diagnostic company that develops and markets novel non-invasive genomics tests to aid in the diagnosis and evaluation of melanoma. The Debtors' flagship product is their DermTech Melanoma Test™ (the "DMT"), a laboratory developed scalable genomics assay to clinically assess pigmented skin lesions for melanoma using non-invasive collection of patient samples using adhesive patches, as shown below, known as the DermTech Smart Sticker™ (together with the DMT and the Debtors' assays, the "Products"). In contrast to the existing standard of care of using a scalpel to biopsy suspicious lesions, the Products provide an objective, non-invasive, higher negative predictive value, and lower cost means of assessing pigmented lesions suspicious of melanoma and guiding the clinician's decision of whether to biopsy. The DMT has been demonstrated to rule out melanoma with a negative predictive value of 99%. The DMT is performed in the Debtors' molecular laboratory in San Diego, California. The Debtors also provide research laboratory services to several pharmaceutical companies which access the Debtors' technology on a contract basis to further clinical trials and studies related to other skin diseases and to measure the response of drugs under development.



7.      The DMT is an easy-to-use technology platform that integrates seamlessly into the current clinical diagnostic pathway by providing (i) simple and rapid tissue collection and shipping via standard express mail, (ii) sample processing via quantitative polymerase chain reaction assays, and (iii) results reported to a physician typically within five (5) business days of the receipt of the sample from the Debtors' laboratory. Simply put, as depicted below, use of the DMT provides a non-invasive and non-surgical option for clinicians to readily evaluate pigmented lesions suspicious for melanoma to differentiate benign moles that may be safely monitored and need not be biopsied, from at-risk moles that a clinician determines should undergo biopsy.



8.      As described below, prior to the commencement of these chapter 11 cases, the Debtors experienced declining liquidity as a result of, among other things, (i) substantial costs associated with production, research and development, marketing, sales and other expenses related to the commercialization and sale of the Products, (ii) challenges with payor reimbursement, (iii) certain litigation matters pending against the Debtors, (iv) significant costs

in complying with public company reporting obligations, and (v) substantial lease and other costs related to the Debtors' laboratory and office space.

9.      As a result of these issues, the Debtors' board of directors (the "Board") undertook a variety of initiatives to reduce spend and investigate strategic opportunities. In early November 2023 through the end of December 2023, TD Cowen (f/k/a Cowen and Company, LLC) ("Cowen") led confidential fundraising efforts which only yielded highly dilutive financing offers. In January of 2024, the Company engaged Cowen to serve as its advisor and investment banker. In connection with such retention, the Company and Cowen worked together to analyze the Company's financial and operational position, and Cowen assisted the Company in exploring strategic transactions. Following Cowen's engagement, Wilson Sonsini Goodrich & Rosati, P.C. ("WSGR"), which has provided counsel to the Company on a variety of matters since 2013, began serving as the Company's restructuring counsel. The Debtors also retained AlixPartners to serve as their financial and restructuring advisor in March of 2024.

10.     The Board and the Debtors' management have worked closely with WSGR, Cowen, and AlixPartners to explore various restructuring options, including an extensive prepetition search for a strategic partner or acquirer of substantially all of the Company's assets led by Cowen, and an operational review facilitated by AlixPartners and WSGR.

11.     After nearly five months of outreach and negotiations with potential acquirers, the Debtors determined that continuing their marketing and strategic process in chapter 11 provided the clearest path to maximize value.  The Debtors remain in active discussions with several parties regarding a transaction and believe that marketing their assets as a going concern with the benefits afforded to a buyer under the Bankruptcy Code will provide significant advantages that were not available during the prepetition marketing process.

12.     The Debtors enter Chapter 11 with approximately $15.4 million in cash on hand to fund these chapter 11 cases, implement their post-petition sale process, and exit chapter 11 through a plan process. Given their liquidity profile and the anticipated expense of these cases and operations in the chapter 11 environment, the Debtors intend to request authority to consummate a sale of their assets on a timeline that balances the Debtors' liquidity needs with their significant prepetition marketing efforts to best position the Debtors to maximize value for their stakeholders.

## BACKGROUND

13.     To assist the Court and parties in interest in understanding the Debtors' business and the relief being sought in the First Day Motions, this Declaration is organized as follows:

- *Part I* provides a general overview of the Company's corporate history and business operations;

- *Part II* provides an overview of the Company's prepetition capital structure;

- *Part III* describes the circumstances leading to the filing of these chapter 11 cases; and

- *Part IV* discusses the First Day Motions.

I.      **GENERAL BACKGROUND**

A.      **The Company's Corporate History**

14.     Debtor DermTech, Inc. (f/k/a Constellation Alpha Capital Corp.) was originally incorporated in the British Virgin Islands in 2015 and domesticated in the State of Delaware in 2019. Debtor DermTech Operations, Inc. (f/k/a DermTech, Inc.) was initially incorporated in California in 1995 and reincorporated in the State of Delaware in 2014.  The Debtors' early activities were primarily focused on developing and validating the underlying technology for the Products, generating clinical data to support payor reimbursement efforts, and marketing the Products to a large group of dermatology clinicians.

15.     On May 29, 2019, Debtor DermTech, Inc., Debtor DermTech Operations, Inc., and DT Merger Sub, Inc., a then wholly owned subsidiary of Debtor DermTech, Inc. ("Merger Sub"), entered into an *Agreement and Plan of Merger* (as amended, the "Merger Agreement"). Pursuant to the terms of the Merger Agreement, on August 29, 2019, Merger Sub merged with and into DermTech Operations, Inc., with DermTech Operations, Inc. surviving as a wholly owned subsidiary of DermTech, Inc. (the "Business Combination"). In connection therewith, two days prior to the completion of the Business Combination, DermTech, Inc. domesticated from the British Virgin Islands to Delaware.  DermTech Operations, Inc. changed its name from "DermTech, Inc." shortly before the completion of the Business Combination. On August 29, 2019, immediately following the completion of the Business Combination, DermTech, Inc. changed its name from "Constellation Alpha Capital Corp." and then effected a one-for-two reverse stock split of its common stock.

B.      **The Company's Operations**

16.     As of the Petition Date, the Debtors have approximately 60 employees located in California and elsewhere in the United States. The Debtors' business is headquartered in San

Diego, California.

17.     The Debtors' Products are processed within its 13,000 square foot laboratory in San Diego, California.   All testing is performed by clinical laboratory scientists holding appropriate state licenses who utilized qPCR techniques to extract and purify the genomic material adhered to the Smart Stickers™. After testing is complete, a laboratory report is prepared and reviewed by one of the Debtors' laboratory directors, which report is then made available to the ordering clinician by facsimile, internet portal, or through an electronic medical record system that is compliant with the requirements of the Health Insurance Portability and Accountability Act ("HIPAA").

18.     To reach its end-users, the Company marketed its Products through a dedicated sales force directly to clinicians. The Company also has established contractual relationships with certain preferred provider networks and national governmental payors and lab benefit managers to secure favorable reimbursement for the DMT.

19.     The Debtors' revenue is generated from two revenue streams: test revenue and contract revenue. The Debtors generate test revenue through laboratory services that are billed to Medicare, private medical insurance companies and pharmaceutical companies that order the Company's laboratory services. Such services can include sample collection kits, test development, patient segmentation and stratification, genomic analysis, data analysis, and reporting. Test revenue can be highly variable as it is based on payments received by government and private insurance payors that are and are not under contract and can vary based on patient insurance coverage, deductibles, and co-pays. Due to the nature of the Company's test revenue, it can take a significant amount of time to collect upon billed tests.

20.     Contract revenue is generated from the sale of laboratory services and skin sample adhesive collection kits for research use only (the "<u>Kits</u>") to third-party companies through contract research agreements. Such contract research agreements include the Debtors provisioning the Kits and performing various laboratory assays and analysis for biopharmaceutical companies to facilitate the development of drugs designed to treat dermatologic conditions.

21.     Prior to the Petition Date, the Debtors were working to: (i) expand awareness and adoption of the DMT to a broader group of dermatology clinicians; (ii) expand payor coverage for the DMT and improve average selling price and revenues while reducing operating costs, (iii) expand clinical research services to pharmaceutical companies developing drug products in dermatology, and (iv) leverage the Smart Sticker™ specimen collection platform in development of new laboratory tests to diagnose or support the diagnosis of non-melanoma skin cancers as well as a variety of inflammatory skin conditions or to develop complementary and companion diagnostics for the drug product candidates of the Debtors' pharmaceutical partners.

## II.     THE DEBTORS' PREPETITION CORPORATE AND CAPITAL STRUCTURE

22.     Debtor DermTech Inc. currently directly owns and controls 100% of Debtor DermTech Operations, Inc. A summary chart depicting the Debtors' corporate structure is attached hereto as **<u>Exhibit A</u>**.

23.     As of the Petition Date, the Debtors do not have any outstanding funded debt obligations.

### A.     Common Stock

24.     DermTech, Inc. is a publicly traded company. Prior to the Petition Date, its common stock was listed on the NASDAQ Capital Market under the ticker symbol "DMTK." In April, 2024, DermTech, Inc. received notice from NASDAQ that it was no longer in compliance

with NASDAQ listing requirements, specifically the minimum bid price requirement, and that compliance must be regained on or prior to October 14, 2024. DermTech, Inc. is currently within the specified cure periods for such deficiencies. As of June 17, 2024, there were 35,253,581 shares of DermTech, Inc.'s common stock outstanding.

### B.   At the Market Offering Programs

25.   In November 2020, in connection with the Company's launch of an "at the market" offering program (the "Offering Program"), the Company entered into a sales agreement (the "2020 Sales Agreement") with Cowen. Under the 2020 Sales Agreement, the Company could offer and sell its common stock from time to time having an aggregate offering price of up to $50 million during the term of the 2020 Sales Agreement. Through December 31, 2021, the Company issued an aggregate of 1,482,343 shares of common stock pursuant to the 2020 Sales Agreement. The Company next issued stock under the 2020 Sales Agreement in 2023, when it issued an aggregate of 2,038,661 shares of common stock. As of December 31, 2023, the 2020 Sales Agreement has been fully utilized and no additional shares of common stock may be sold pursuant to the 2020 Sales Agreement.

26.   On August 8, 2022, the Company entered into a sales agreement with Cowen relating to the sale of shares of the Company's common stock from time to time with an aggregate offering price of up to $75 million (the "2022 Sales Agreement"). The Company did not issue any shares of common stock pursuant to the 2022 Sales Agreement prior to the year ended December 31, 2022. During 2023, the Company issued an aggregate of 130,598 shares of common stock pursuant to the 2022 Sales Agreement. No further stock has been issued under the 2022 Sales Agreement.

### C.      Publicly Traded Warrants

27.      The Debtors' publicly traded warrants currently trade on the pink slips under the ticker symbol "DMTKW." The publicly traded warrants are subject to that certain *Warrant Agreement*, dated as of June 19, 2017, between the Company and Continental Stock Transfer & Trust Company.

### D.      SPAC Warrants

28.      The Company previously issued a total of 14,936,250 SPAC warrants to purchase common stock in public offering and private placement offerings which were consummated on June 23, 2017 (the "SPAC Warrants"). The SPAC Warrants have a five-year life from the date the Business Combination was consummated. Every four (4) SPAC Warrants entitle the holder to purchase one (1) whole share of common stock at an exercise price of $23.00 per whole share. Outstanding SPAC Warrants totaled 2,815,853 as of the Petition Date.

### E.      Placement Agent Warrants

29.      In connection with several of the Debtors' financings that took place from 2015 to 2018, the Debtors engaged a registered placement agent to assist with the marketing and selling of common and preferred units and issued certain seven-year warrants to purchase one (1) share of the Debtors' common stock at a specified price. These warrants have largely expired as of the Petition Date, with the exception of warrants issued in 2018. In 2020, the Debtors issued 15,724 seven-year warrants to purchase one (1) share of common stock at an exercise price of $9.54 per share. As of the Petition Date, outstanding placement agent warrants total 570.

## III.    EVENTS LEADING TO THESE CHAPTER 11 CASES

30.      As detailed below, the need to reorganize the Company and address the Debtors' liquidity needs arose from a number of factors that affected the Company's performance over recent years.  In response, the Debtors' management and the Board took various steps to address

liquidity and operational issues, including engaging in negotiations regarding a potential out of court transaction that would have avoided the need to commence these chapter 11 cases. Ultimately, however, after considering these options and conducting a prepetition marketing process for the sale of all of the Company's assets, the Debtors determined value would be best maximized by the commencement of these chapter 11 cases to, among other things, consummate a sale transaction.

**A.      General Conditions Affecting The Company's Liquidity**

31.      Since the Company's inception in 2015, it has never been profitable and has historically incurred substantial net losses, including net losses of $100.9 million and $116.7 million in 2023 and 2022, respectively.

**i.      Costs to Scale the Company's Growth Have Outpaced Its Revenue Streams**

32.      The Company has incurred significant expenses related to the commercial growth of its business, including costs associated with scaling laboratory operations, as well as increased sales, marketing, research and administrative expenses.  To address these costs, the Debtors have sought to raise additional capital through equity offerings, debt financings, collaborations, or licensing arrangements, but none of these strategies has produced sustainable capital to enable the Debtors' business to continue as a going concern.

**ii.      Compliance With Public Company Reporting Requirements Has Further Tightened the Company's Liquidity**

33.      As the Company undertook efforts to grow its business, roll out the Products, pursue new customers, and develop and commercialize additional testing products, collaborations, and relationships with key pharmaceutical and laboratory partners, it incurred significant additional expenses related to being a public company. For example, the Sarbanes-Oxley Act of 2002, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010,

and other rules implemented by the SEC and NASDAQ, impose various requirements on public companies, including requiring changes in corporate governance practices that increase compliance costs associated with financial reporting and the maintenance of internal controls (among other things). In addition, under such rules and regulations, the Company and its management are required to expend considerable time and resources preparing and filing quarterly and annual reports, as well as other SEC disclosures and filings, in addition to their typical duties.

### iii.     The Debtors' Lease Obligations Have Further Constrained Liquidity

34.     DermTech, Inc. is party to that certain *Office Lease*, dated as of July 1, 2023 (as amended, the "Lease"), with Kilroy Realty, L.P. (the "Landlord"). The Lease is the Debtors' only real-property related obligation. The leased premises serve as the office space for the Company's leadership and employees and also house the Debtors' highly complex molecular laboratory facilities.  Prior to the Petition Date, the Debtors and their advisors engaged with the Landlord in an effort to amicably resolve outstanding issues related to the Lease for several months.  On May 15, 2024, the Landlord filed a complaint against DermTech, Inc. with the Superior Court of the State of California alleging that an event of default had occurred under the Lease due to the Debtors' purported failure to pay past due rent in the amount of $661,706.34, the approximate monthly rent due under the Lease.  As of the Petition Date, the Debtors and the Landlord have not reached a resolution with regard to the Lease.

### iv.     Pending Securities Litigation Has Further Required Considerable Time, Expense, and Attention of the Company

35.     The Company and certain of its current and former officers and directors are defendants in two putative class action lawsuits and one shareholder derivative suit pending in the United States District Court for the Southern District of California (the "Securities

Litigation"). The plaintiffs in the Securities Litigation allege, among other things, violation of the Securities Exchange Act of 1934 for allegedly false and misleading statements regarding the Company's business, as well as related claims for breach of fiduciary duties, unjust enrichment, gross mismanagement, abuse of control, and waste of corporate assets.  Although the Securities Litigation is still in early stages, and in the Company's view, lacks merit, the Company has already expended considerable resources defending it and, absent the commencement of these chapter 11 cases, anticipated continuing to do so in the future.

     **v.**    **The Nature of the Debtors' Products Requires Compliance with Myriad Costly and Time-Consuming Regulations**

36.    The Debtors' products and services are regulated by federal and state governmental authorities. Failure to comply with applicable laws and regulations can subject the Debtors to repayment of amounts previously paid to them, significant civil and criminal penalties, loss of licensure, certification, or accreditation, or exclusion from participation in governmental healthcare programs.

37.    The Debtors' laboratory is required to hold certain federal, state, and local licenses, certifications, and permits to conduct business, including compliance with the Clinical Laboratory Improvement Amendments (CLIA) of 1988 ("CLIA") because the laboratory performs testing on human specimens for the purpose of providing information for the diagnosis, prevention, or treatment of disease. To renew their CLIA certificate, the Debtors are subject to biennial survey and inspection. The Debtors are also required to comply with state regulations related to laboratory permits in New York, California, and various other states in which the Debtors do business.

38.    The Debtors are also a "Covered Entity" under HIPAA because they conduct certain healthcare transactions electronically that involve the use or disclosure of individually

identifiable health information, or "PHI." As a Covered Entity, the Debtors are subject to audit by the United States Department of Health and Human Services and may be investigated in connection with a privacy or data security complaint or reported breach or an audit related to the Debtors' HIPAA-compliance.

### vi.    Competitiveness of the Debtors' Market

39.     The market for molecular diagnostics is extremely competitive. Within this market, the Debtors compete with new and traditional medical devices and other technologies used to assist physicians with the assessment of pigmented lesions and diagnosis of skin cancer. Although the Debtors are currently the only company to offer clinical dermatology professionals a non-invasive genomics test to rule out melanoma, multiple of the Debtors' competitors are working on minimally invasive genomic tests for the assessment of skin diseases and several companies currently market or are developing devices and imaging tools to assess melanoma.

40.     The Debtors also compete with mainstream clinical diagnostic methods, used by dermatologists for many years, which focus on visual tumor tissue analysis. In recognition of such practice's foothold in the field of dermatology, the Debtors have expended considerable resources aimed at changing the methods or behavior of dermatologists and physicians to incorporate the DMT and the Smart Sticker™ into their practices in conjunction with, or in support of clinicians' decision-making to perform tissue biopsies and analysis.

41.     All of these factors have made it difficult for the Debtors' products to gain market acceptance and the need to stay ahead of this competition has driven the Debtors' ongoing R&D and sales and marketing costs for their Products higher and higher, with adverse effects on the Debtors' working capital, total assets, and stockholders' equity.

### vii.    Payor Reimbursement

42.    General uncertainty surrounds payor reimbursement, including governmental and commercial payors, for any test incorporating new technology, such as the tests developed using the Debtors' technologies. As each payor generally determines for its own enrollees or insured patients whether to cover or otherwise establish a policy to reimburse for the Debtors' tests, seeking payor approvals is a time-consuming and costly process. Payors can change, and have changed, their policies and procedures regarding their coverage of or reimbursement for the Debtors' tests, from time to time, even after the Debtors have received relevant payor approvals.

### B.    Previous Efforts To Sell or Restructure The Company

43.    Against the backdrop of these challenges and as disclosed in its SEC filings, the Company has been contemplating restructuring-related initiatives for some time.  On June 26, 2023, the Board approved certain restructuring actions intended to prioritize the significant growth opportunities for the DMT, streamline the Company's operations, suspend pipeline programs, and significantly reduce overall operating expenses, primarily related to the Debtors' sales, marketing, and administrative functions.  Implementation of this plan resulted in the reduction of the Company's workforce by approximately 15% with estimated annualized cost savings of between $25 million and $30 million.

44.    In January and April of 2024, the Board approved additional restructuring actions to continue to align the Company's resources with its previously announced strategic prioritization for the DMT, including operating expense reductions and reduction of the Company's workforce by approximately 130 employees.

45.    Given the Debtors' simultaneous liquidity constraints and their efforts to sell or restructure their operations, the Debtors executed an additional reduction in force of 15

employees effective as of June 17, 2024. Thus, as of the Petition Date, the Company has approximately 60 employees.

### i. The Pre-Bankruptcy Sale Process

46. In addition, the Board has worked with the Company's advisors to continue to pursue various restructuring alternatives, including a sale of substantially all of the Company's assets through a chapter 11 bankruptcy proceeding.

47. As set forth above, the Debtors engaged Cowen to serve as their investment banker, to assist in canvassing the market for interested buyers. In January, 2024, Cowen began marketing the Company by conducting outreach to potential acquirers, facilitating their due diligence requests, and entering into non-disclosure agreements ("NDAs") with such potential acquirers. As of the Petition Date, 49 potentially interested purchasers were contacted. Approximately 16 parties executed NDAs and 12 parties received access to the virtual data room. The Company remains in active discussions with various potential bidders and is confident that the sale process in chapter 11 will enable a successful outcome for the Company's assets that will maximize value for all stakeholders.

## IV. FIRST DAY MOTIONS AND RELATED RELIEF REQUESTED

### A. First Day Motions

48. In connection with the filing of their chapter 11 petitions, the Debtors filed the below-listed First Day Motions, which are explained in greater detail in **Exhibit B**, requesting relief that the Debtors believe is necessary to enable them to administer their estates with minimal disruption and value loss during these chapter 11 cases. The facts set forth in each of the First Day Motions are incorporated herein in their entirety.[2]

---

[2] Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

    **(i)**    **Administrative Motions:**

        (1)    <u>Joint Administration Motion</u>. *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief*;

        (2)    <u>Claims and Noticing Agent Retention Application</u>. *Debtors' Application for Entry of an Order (I) Authorizing Appointment of Stretto, Inc. as Claims and Noticing Agent; and (II) Granting Related Relief*; and

        (3)    <u>Creditor Matrix Motion</u>. *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated (1) Creditor Matrix and (2) Top Thirty Creditors List, and (B) Redact Certain Personal Identification Information in the Creditor Matrix and Certain Other Documents; (II) Modifying the Requirement to File a List of All Equity Security Holders and Modifying Notice Requirements to Equity Security Holders; and (III) Granting Related Relief.*

    **(ii)**    **Operational Motions Requiring Immediate Relief:**

        (4)    <u>Cash Management Motion</u>. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue Certain Intercompany Transactions; (II) Extending the Time to Comply with Section 345(b) of the Bankruptcy Code; and (III) Granting Related Relief*;

        (5)    <u>Utilities Motion</u>. *Debtors' Motion for Entry of Interim and Final Orders (I)(A) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (B) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (C) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services; and (II) Granting Related Relief*;

        (6)    <u>Wages Motion</u>. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Employee Benefits Obligations, and Other Compensation, and (B) Continue Employee Benefits Programs and Pay Related Administrative Obligations; and (II) Granting Related Relief*;

        (7)    <u>NOL Motion</u>. *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 362(a)(3) and 541 of the Bankruptcy Code and Bankruptcy Rule 3001, Establishing Notice and Hearing*

> *Procedures for Trading in, or Certain Claims of Worthlessness with Respect to, Equity Securities in DermTech, Inc.*;

> (8)   <u>Refund Program Motion</u>. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Honor Certain Prepetition Obligations to Payors and (B) Otherwise Continue the Refund Program in the Ordinary Course of Business; and (II) Granting Related Relief*; and

> (9)   <u>Patient Confidentiality Motion</u>. *Debtors' Motion for Entry of an Order (I) Authorizing Certain Procedures to Maintain the Confidentiality of Patient Information as Required by Applicable Privacy Rules; and (II) Granting Related Relief.*

49.    The First Day Motions request authority to, among other things, honor workforce-related compensation and benefits obligations, pay certain prepetition claims, and continue the Debtors' cash management system and other operations in the ordinary course of business to ensure minimal disruption of the Debtors' business operations during the pendency of these chapter 11 cases.  For the avoidance of doubt, the Debtors request authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in the First Day Motions.

50.    The Debtors have tailored their requests for immediate relief to those circumstances where there is a risk of immediate and irreparable harm to the Debtors and their estates.  I believe an orderly transition into chapter 11 is critical to the viability of the Debtors' operations and that any delay in granting the relief described below could hinder the Debtors' operations and cause irreparable harm.

51.    I have reviewed each of the First Day Motions and am familiar with the content and substance contained therein.  The facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on other corporate officers and advisors and I can attest to such facts.  I believe that the relief requested in each of the First Day Motions listed below (a) is necessary to allow the Debtors to operate with minimal

disruption and productivity losses during these chapter 11 cases, (b) is essential to achieving a successful chapter 11 outcome, and (c) serves the best interests of the Debtors' stakeholders.

## <u>CONCLUSION</u>

52.      The Debtors' ultimate goal in these chapter 11 cases is to achieve an orderly, efficient, consensual, and successful chapter 11 process to maximize the value of the Debtors' estates for their stakeholders.  To minimize any loss of value, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the course of these chapter 11 cases, with as little interruption or disruption to the Debtors' operations as possible.  I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives and completing a successful reorganization of the Debtors' businesses will be substantially enhanced.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: June 18, 2024

*/s/ Bret Christensen*
Bret Christensen
President and Chief Executive Officer
DermTech, Inc. and its debtor affiliates

**EXHIBIT A**

**Corporate Structure Chart**

# DermTech Organizational Chart



**<u>EXHIBIT B</u>**

**Evidentiary Support for First Day Motions**

I.      **DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) DIRECTING JOINT ADMINISTRATION OF RELATED CHAPTER 11 CASES AND (II) GRANTING RELATED RELIEF (THE "<u>JOINT ADMINISTRATION MOTION</u>").[1]**

1.      Pursuant to the Joint Administration Motion, the Debtors request entry of an order (a) directing joint administration of these chapter 11 cases for procedural purposes only and (b) granting related relief.  Given the integrated nature of the Debtors' operations, I believe joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of parties in interest.

2.      I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the pendency of these chapter 11 cases. Accordingly, I respectfully request that the Court enter an order approving the relief requested by the Joint Administration Motion.

II.     **DEBTORS' APPLICATION FOR ENTRY OF AN ORDER (I) AUTHORIZING APPOINTMENT OF STRETTO, INC. AS CLAIMS AND NOTICING AGENT; AND (II) GRANTING RELATED RELIEF (THE "<u>CLAIMS AND NOTICING AGENT RETENTION APPLICATION</u>").**

3.      Pursuant to the Claims and Noticing Agent Retention Application, the Debtors seek entry of an order appointing Stretto, Inc. ("<u>Stretto</u>") to serve as claims and noticing agent in the Debtors' chapter 11 cases effective as of the Petition Date. The Debtors received proposals from three (3) service providers and selected Stretto as the most competitive proposal given Stretto's capabilities and the circumstances of these chapter 11 cases.

4.      I believe that the relief requested in the Claims and Noticing Agent Retention Application is in the best interests of the Debtors' estates, their creditors, and all other parties in

---

[1]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the applicable First Day Motion.

interest, and will enable the Debtors to continue to operate their business during the pendency of these chapter 11 cases.  Moreover, I understand that the Debtors are required to retain a claims and noticing agent under the Court's rules.  Accordingly, on behalf of the Debtors, I respectfully request that the Court enter an order approving the relief requested by the Claims and Noticing Agent Retention Application.

III.    **DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) FILE A CONSOLIDATED (1) CREDITOR MATRIX AND (2) TOP THIRTY CREDITORS LIST, AND (B) REDACT CERTAIN PERSONAL IDENTIFICATION INFORMATION IN THE CREDITOR MATRIX AND CERTAIN OTHER DOCUMENTS; (II) MODIFYING THE REQUIREMENT TO FILE A LIST OF ALL EQUITY SECURITY HOLDERS AND MODIFYING NOTICE REQUIREMENTS TO EQUITY SECURITY HOLDERS; AND (III) GRANTING RELATED RELIEF (THE "<u>CREDITOR MATRIX MOTION</u>").**

5.      Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order (i) authorizing the Debtors to (a) file a consolidated (1) list of creditors in lieu of submitting a separate mailing matrix for each Debtor, and (2) list of the Debtors' thirty (30) largest unsecured creditors in lieu of submitting a separate list for each Debtor; (b) redact certain personal identification information in the creditor matrix and certain other documents; (ii) modifying the requirement that the Debtors file a list of all of their equity security holders and modifying notice thereto; and (iii) granting related relief.

6.      I believe that filing a single consolidated list of the Debtors' thirty (30) largest unsecured creditors, and redacting personally identifiable information of individuals**,** is warranted in these chapter 11 cases.  Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task, would lead to administrative burdens and costs, and could result in duplicate mailings.

7.      Moreover, because DermTech, Inc. is a publicly traded company with approximately 35,253,581 shares of its common stock outstanding as of June 17, 2024 and

2

beneficial ownership of such common stock is widely dispersed and subject to change. The Debtors do not maintain a complete list of their equity security holders and therefore must obtain the names and addresses of certain their stockholders from a securities agent. If the requirement to file a list of equity security holders is not modified as set forth in the Creditor Matrix Motion, DermTech would have to try to obtain the names and addresses of presently unknown stockholders from transfer agents and brokerage firms. The process of obtaining such names and addresses and sending notices to all such holders would be burdensome, time consuming, and expensive. Specifically, to obtain the list of beneficial holders, DermTech would have to request that its transfer agent, Continental Stock Transfer & Trust Company (the "Transfer Agent"), contact all registered holders, banks, brokers, intermediaries, and other nominees (collectively, the "Nominees") that hold stock in "street name" for the beneficial holders of the stock, as applicable, and request that all such Nominees review their books and records to identify the identity of the applicable beneficial holder(s). Beneficial holders would have an opportunity to reject the release of their identities, in which case the brokerage firms would not be permitted to disclose their identities, even upon a written request by DermTech.

8.      Consequently, through the Creditor Matrix Motion the Debtors are requesting that the requirement to file a list of all of DermTech, Inc.'s equity security holders be modified that such that the Debtors will file a list of all known registered holders of the Debtors' common stock (the "DermTech Stock") as of June 17, 2024.

9.       Through the Creditor Matrix Motion, the Debtors further request that notice requirements to such equity holders be modified to allow the Debtors to provide notice by: (i) publishing the notice of commencement of these chapter 11 cases (the "Notice of Commencement") on the case website established by Stretto, (ii) filing a Form 8-K with the SEC

within four (4) business days following the Petition Date, notifying the Debtors' investors and other parties of the commencement of these chapter 11 cases, (iii) serving by first class mail, the Notice of Commencement and all other notices in these chapter 11 cases on all known registered holders of DermTech Stock as soon as practicable after entry of the order granting this Motion, and (iv) serving by first class mail, the Notice of Commencement and all other notices in these chapter 11 cases on the Transfer Agent and all of the Nominees that hold stock in "street name" for the beneficial holders of the equity interest, as applicable.

10.     I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the pendency of these chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully request that the Court enter an order approving the relief requested by the Creditor Matrix Motion.

IV.     **DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO, (C) MAINTAIN EXISTING BUSINESS FORMS, AND (D) CONTINUE CERTAIN INTERCOMPANY TRANSACTIONS; (II) EXTENDING THE TIME TO COMPLY WITH SECTION 345(B) OF THE BANKRUPTCY CODE; AND (III) GRANTING RELATED RELIEF (THE "CASH MANAGEMENT MOTION").**

11.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors, in their sole discretion, to (a) continue to operate their Cash Management System (as defined below); (b) pay any prepetition or post-petition amounts outstanding on account of the Bank Claims (as defined below); (c) maintain existing Business Forms (as defined below) in the ordinary course of business; (d) continue to perform Intercompany Transactions (as defined below) consistent with historical practice; (ii) waiving the requirements of section 345(b) of the Bankruptcy Code on an interim basis; and (iii) granting related relief.

12.     To facilitate the efficient operation of their business, the Debtors operate an integrated system of Bank Accounts (the "Cash Management System").  As of the Petition Date, the Cash Management System includes a total of six (6) bank accounts (collectively, the "Bank Accounts").  The  Bank Accounts are maintained at either Pacific Western Bank and Bank of America and all of the Bank Accounts are held by Debtor DermTech Operations, Inc.  The process through which the Debtors receive payments, make cash disbursements, and transfer funds between the Bank Accounts is described in greater detail in the Cash Management Motion and Exhibit C attached to the Cash Management Motion.

13.     As part of the Cash Management System, the Debtors have provided approximately ten (10) employees with corporate credit cards issued by JP Morgan Chase Bank, N.A. (the "Corporate Cards") to cover legitimate business expenses, including travel and meal expenses, incurred in the ordinary course of business in connection with their employment as well as certain vendor payments.  I believe that the ability of the Debtors to use the Corporate Cards on a go-forward basis is essential to the continued operation of the Debtors' business and the corporate administration thereof to provide assurance to the relevant employees that they will be able to purchase certain business expenses without having to seek reimbursement from their own account or otherwise seek proper remittance.  Accordingly, it is my belief that the Debtors' inability to maintain the Corporate Cards would result in unnecessary hardship on the continued operation of the Debtors' business.  I therefore believe that the Debtors should be authorized to continue honoring obligations in relation to the Corporate Cards on a post-petition basis in the ordinary course of business.

14.     To maintain the integrity of their Cash Management System, I believe that the Debtors should be allowed to pay all prepetition Bank Fees and to continue to pay Bank Fees in

the ordinary course on a post-petition basis.  Additionally, to normalize operations and avoid the disruption that would otherwise occur if the Bank Accounts were frozen pending payment or resolution of disputes regarding the priority of claims or rights of recoupment, it is my belief that the Debtors should have the authority, in their sole discretion, to pay or reimburse each applicable Bank in the ordinary course of business for any Bank Claims arising prior to, on, or after the Petition Date.

15.     The Debtors also use various pre-printed documents (the "Business Forms"), such as checks, invoices, and letterhead, in the ordinary course of business.  Because the Business Forms were used prepetition, they do not reference the Debtors' current status as debtors in possession. Nonetheless, most parties doing business with the Debtors will be aware of the Debtors' status as debtors in possession as a result of the publicity surrounding these chapter 11 cases and the notice of commencement served on parties in interest.  Requiring the Debtors to change existing Business Forms at this critical juncture in these chapter 11 cases would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates.  Thus, I believe that the Debtors should be authorized to use their existing Business Forms without placing a "Debtor In Possession" legend on each, until their existing stock is depleted.  Once the Debtors have exhausted their existing stock of checks or forms, any new check stock or subsequently printed checks or forms will bear the designation "Debtor In Possession" with the joint case number.  To the extent that checks or forms are prepared electronically, the debtors will add a "Debtor In Possession" designation to such checks within fourteen (14) days of the Petition Date.

16.     Because Debtor DermTech Operations, Inc. is the holder of all Bank Accounts used to process and receive payments across the Debtors' Cash Management System, all disbursements that are required for the Debtors' business operations, including disbursements made on behalf of

Debtor DermTech, Inc. (if any) are made by Debtor DermTech Operations, Inc. This enables the Debtors to, among other things, complete transactions with administrative ease, fund ordinary course business expenses, and facilitate operations on a daily basis. Such transactions (the "Intercompany Transactions") are trackable and the Debtors intend to track all post-petition Intercompany Transactions in the ordinary course of business.

17.     Due to the nature of the Debtors' business and the disruption to the business that would result if the Debtors were required to close their existing Bank Accounts, I believe that it is critical that the Debtors' Cash Management System remains in place on a post-petition basis.

18.     Finally, I believe that the Debtors have demonstrated cause to modify certain requirements of section 345(b) of the Bankruptcy Code with respect to the Debtors' deposit practices and the Bank Accounts included in the Debtors' Cash Management System. All of the Bank Accounts comply with the requirements of section 345(b) of the Bankruptcy Code. The Debtors' Bank Accounts are maintained at Bank of America and Pacific Western Bank (which has merged with Banc of California).[2] Both Bank of America and Banc of California have executed a Uniform Depository Agreement with, and are designated as authorized depositories by, the U.S. Trustee, pursuant to the U.S. Trustee Guidelines. Additionally, all of the Bank Accounts are insured by the FDIC. Moreover, as detailed in the Cash Management Motion, pursuant to the Intrafi cash sweep, excess cash is transferred into demand deposit accounts at multiple participating banks in the IntraFi network, so that all of the funds in the Primary Interest-Bearing Account are protected within FDIC limits, as none of the individual deposits at any participating

---

[2]     Pacific Western Bank merged with Banc of California, Inc. ("Banc of California") on November 30, 2023. Press Release, Banc of California, *Banc of California Announces Completion of Transformational Merger with PacWest Bancorp and $400 Million Equity Raise* (Nov. 30, 2023), https://investors.bancofcal.com/news-events-and-presentations/press-releases/news-details/2023/Banc-of-California-Announces-Completion-of-Transformational-Merger-with-PacWest-Bancorp-and-400-Million-Equity-Raise/default.aspx.

institution exceeds $250,000 at any given time. The Debtors maintain immediate access to the funds swept into the IntraFi network. Thus, I believe that any funds that are deposited in these Bank Accounts are and will remain secure during the pendency of these chapter 11 cases.

19.     Nevertheless, out of an abundance of caution, I believe that a 30-day (or such longer period as the U.S. Trustee may agree) extension of time to address any questions that the U.S. Trustee may have regarding the Cash Management System and, should the U.S. Trustee have concerns regarding the Bank Accounts, to make such arrangements as are acceptable to the U.S. Trustee (without prejudice to the Debtors' rights to seek further modifications or extensions of time) is appropriate and beneficial to the Debtors.

20.     Thus, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the pendency of these chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully request that the Court enter an order granting the relief requested by the Cash Management Motion.

## V.    DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I)(A) APPROVING THE DEBTORS' PROPOSED ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE UTILITY SERVICES, (B) APPROVING THE DEBTORS' PROPOSED PROCEDURES FOR RESOLVING ADDITIONAL ASSURANCE REQUESTS, AND (C) PROHIBITING UTILITY PROVIDERS FROM ALTERING, REFUSING, OR DISCONTINUING SERVICES; AND (II) GRANTING RELATED RELIEF (THE "UTILITIES MOTION").

21.     Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders (i)(a) approving the Debtors' proposed form of adequate assurance of payment for future utility services to the Utility Providers, (b) approving the Debtors' proposed Adequate Assurance Procedures, and (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services; and (b) granting related relief.

22.     I believe the Debtors require the Utility Services to properly maintain and support their ongoing business operations.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted.  In my estimation, such disruption would adversely affect, among other things, customer goodwill and employee relations, which, in turn, would jeopardize the Debtors' reorganization efforts.  Therefore, it is imperative that Utility Services continue uninterrupted during these chapter 11 cases.

23.     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the pendency of these chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully request that the Court enter an order granting the relief requested by the Utilities Motion.

## VI.     DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) PAY PREPETITION WAGES, EMPLOYEE BENEFITS OBLIGATIONS, AND OTHER COMPENSATION, AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS AND PAY RELATED ADMINISTRATIVE OBLIGATIONS; AND (II) GRANTING RELATED RELIEF (THE "WAGES MOTION").

24.     Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders: (i) authorizing, but not directing, the Debtors, in their sole discretion, to (a) pay Prepetition Employee Obligations and related expenses arising under or related to Compensation and Benefits Programs and (b) continue their Compensation and Benefits Programs (as defined below) in effect as of the Petition Date (and as may be amended, renewed, replaced, modified, revised, supplemented, or terminated from time to time in the ordinary course of business) and pay related administrative obligations; and (ii) granting related relief.

25.     The Debtors' Employees and Independent Contractor perform a wide variety of functions, which are mission-critical to the preservation of value and the administration of the

Debtors' estates. In many instances, the Employees and Independent Contractor include personnel who are intimately familiar with the Debtors' businesses, processes, and systems, who have developed relationships with the Debtors' customers, suppliers and other key counterparties that are essential to the Debtors' businesses, and who cannot be easily replaced. Without the continued, uninterrupted services of the Employees and the Independent Contractor, the Debtors' business operations will be halted immediately and the administration of the estates materially impaired.

26.     The Debtors' Employees and Independent Contractor rely on their compensation discussed herein to pay their daily living expenses. Not only will these workers be irreparably harmed if the Debtors are not permitted to continue paying compensation, including the Prepetition Employee Obligations, and providing health and other benefits during these chapter 11 cases, but any interruption in payment will also likely jeopardize their continued performance and loyalty to the Debtors. Consequently, I believe that the relief requested in the Wages Motion is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

27.     It is my belief that each of the Employee Compensation and Benefits are important components of the total compensation offered to the Employees, and are essential to the Debtors' efforts to maintain Employee morale and to minimize Employee attrition. I believe that the expenses associated with the Employee Compensation and Benefits are reasonable and necessary in light of the potential Employee attrition, loss of morale, and loss of productivity that would occur if such programs were discontinued.

28.     Furthermore, the Reimbursable Expenses are ordinary course expenses that the Debtors' Employees incur in performing their job functions. I believe that it is essential to the continued operation of the Debtors' businesses that the Debtors be permitted to continue reimbursing, or making direct payments on behalf of, Employees for the Reimbursable Expenses.

29.     The Debtors paid certain retention bonuses to Employees determined to be critical to the success of their strategic alternatives process in May 2024 and June 2024 (the "Retention Bonus Program"). As of the Petition Date, the majority of the bonuses paid under the Retention Bonus Program have already been paid in full and are generally subject to clawback upon the occurrence of certain specified events. However, one non-insider Employee may become entitled to a payment of up to $25,000 under the Retention Bonus Program during the post-petition period. Subject to entry of the Final Order, the Debtors request the Court's authorization, but not direction, to honor and pay such amounts under the Retention Bonus Program.

30.     As the Debtors pursue an orderly chapter 11 process, I believe it is crucial that the Debtors are able to retain their Employees and the Independent Contractor that are familiar with their operations and have valuable relationships with vendors and customers. Without the continued, uninterrupted services of the Employees and the Independent Contractor, the Debtors' business operations will be halted immediately and the administration of the estates materially impaired.

31.     Furthermore, I respectfully submit that without the requested relief, it is probable that Employees at all levels of the Debtors' organization will leave for alternative employment. Such a development would deplete the Debtors' workforce, hindering the Debtors' ability to implement their chapter 11 strategy. The loss of valuable Employees and the resulting need to recruit new personnel to replenish the Debtors' workforce would be distracting and counterproductive at this critical time, during which the Debtors are restructuring their obligations in chapter 11. Further, it is my belief that if the Debtors lose valuable Employees, they will incur significant expenses in locating, recruiting and training replacements that would far exceed the costs of providing the Employee Compensation and Benefits for a lost Employee. Indeed, I believe

that if the Debtors do not pay the Prepetition Employee Obligations, the remaining Employees may become demoralized and unproductive because of the significant financial strain and other hardship many of the Employees will experience as a result.

32.     In addition to Employee attrition, I believe that failure to maintain the Employee Benefits and Compensation and satisfy the Prepetition Employee Obligations will likely jeopardize Employee morale and loyalty at a time when Employee support is critical to the Debtors' businesses and the successful prosecution of these chapter 11 cases.  The majority of the Debtors' Employees rely exclusively on their compensation and benefits to satisfy their daily living expenses and needs.  These Employees will be exposed to significant financial difficulties and other distractions if the Debtors are not permitted to honor their employee-related obligations.  If the Court does not authorize the Debtors to maintain the Employee Compensation and Benefits and to honor their Prepetition Employee Obligations, many Employees will be deprived of their income and lose access to critical benefits at a time when the Debtors need their Employees to perform their jobs at peak efficiency.  It is my belief that the loss in morale and distraction of Employees worrying about paying their bills and other necessary expenses will harm the Debtors' ability to operate.

33.     I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the pendency of these chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully request that the Court enter an order granting the relief requested by the Wages Motion.

**VII.  DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS, PURSUANT TO SECTIONS 105(A), 362(A)(3) AND 541 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3001, ESTABLISHING NOTICE AND HEARING PROCEDURES FOR TRADING IN, OR CERTAIN CLAIMS OF WORTHLESSNESS WITH RESPECT TO, EQUITY SECURITIES IN DERMTECH, INC. (THE "<u>NOL MOTION</u>").**

34.     Pursuant to the NOL Motion, the Debtors seek entry of interim and final orders establishing notice and hearing procedures that must be followed before certain transfers of, or certain claims of worthlessness for federal or state tax purposes with respect to, equity securities in Debtor DermTech, Inc. ("<u>DermTech</u>") or of any beneficial interest therein, are deemed effective. The procedures for trading in or claiming a worthless stock deduction with respect to, equity securities in DermTech are necessary to protect and preserve the value of the debtors' U.S. federal and state tax attributes, including, but not limited to, significant net operating loss carryforwards ("<u>NOLs</u>" and collectively with any capital losses, unrealized built-in losses, and certain other tax and business credits and other tax attributes, the "<u>Tax Attributes</u>"). As of December 31, 2023, the Tax Attributes at issue here total at least $342 million.

35.     If no restrictions on trading or claiming worthless stock deductions are imposed by the Court, such trading or deductions could severely limit or even eliminate the Debtors' ability to utilize the Tax Attributes, which could lead to significant negative consequences for the Debtors, their estates, creditors, and other stakeholders. To preserve, to the fullest extent possible, the value of such Tax Attributes, the Debtors have requested immediate procedural relief from the Court that will enable them to closely monitor certain transfers of, or certain claims of worthlessness for federal or state tax purposes with respect to, DermTech equity securities, so as to be in a position to act expeditiously, if necessary, to preserve the Tax Attributes.

36.     I believe that the relief requested in the NOL Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will best position the Debtors

to preserve the value of their estates during the pendency of these chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully request that the Court enter an order granting the relief requested by the NOL Motion.

## VIII. DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) HONOR CERTAIN PREPETITION OBLIGATIONS TO PAYORS AND (B) OTHERWISE CONTINUE THE REFUND PROGRAM IN THE ORDINARY COURSE OF BUSINESS; AND (II) GRANTING RELATED RELIEF (THE "REFUND PROGRAM MOTION")

37.     Pursuant to the Refund Program Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to (a) honor certain prepetition obligations to payors and (b) otherwise continue, renew, replace, modify, implement, revise, or terminate the Refund Program (as defined below) in the ordinary course of business consistent with past practices and in the Debtors' sound business judgment. By the Refund Program Motion, the Debtors seek authority to honor all prepetition obligations owed to payors on an interim and final basis, which amounts include prepetition amounts owed as refunds, credits, setoffs, or other non-cash expenditures, subject to a cap of $7,000 on an interim basis.

38.     Prior to the commencement of these chapter 11 cases, in the ordinary course of business, and as is customary in the Debtors' industry to develop and maintain loyalty, the Debtors implemented a refund program with respect to their Products, as described in greater detail below (the "Refund Program"). The Refund Program is designed to generate goodwill, maintain loyalty, and address deficiencies or defects with respect to the Products to maintain the satisfaction of payors and end-users of the Products (the "Payors").

39.     In the ordinary course of business, to the extent that the Products are unable to produce test results, or to the extent that the Debtors receive duplicate payment for the Products, through the Refund Program, the Debtors offer their Payors full or partial refunds from time to time. Refunds are generally issued by check, wire, or ACH to the applicable Payor and the

14

Company incurs approximately $7,000 per month in aggregate amounts owed under the Refund Program. Additionally, as of the Petition Date, the Debtors estimate that they have accrued approximately $5,500 in prepetition obligations under the Refund Program that remain outstanding. However, depending on when the Products are utilized after they are sold, refund claims may continue to accrue well into these chapter 11 cases. The Debtors seek authority to honor prepetition amounts under the Refund program up to an amount not to exceed $7,000 on an interim basis.

40.     I believe that the overall costs of the Refund Program are substantially outweighed by the benefits it produces in terms of payor satisfaction. If the Debtors cannot offer refunds, the Payors may be less likely to cover the Products and physicians and healthcare providers may be less likely to administer the Products.

41.     I believe that the relief requested in the Refund Program Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will best position the Debtors to preserve the value of their estates during the pendency of these chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully request that the Court enter an order granting the relief requested by the Refund Program Motion.

## IX.    DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING CERTAIN PROCEDURES TO MAINTAIN THE CONFIDENTIALITY OF PATIENT INFORMATION AS REQUIRED BY APPLICABLE PRIVACY RULES; AND (II) GRANTING RELATED RELIEF (THE "PATIENT CONFIDENTIALITY MOTION").

42.     Pursuant to the Patient Confidentiality Motion, the Debtors seek entry of an order establishing certain procedures (the "Privacy Procedures") to maintain the confidentiality of patient information as required by HIPAA.  In the absence of the establishment of such procedures, the Debtors believe that they would not be able to adequately ensure that protected health information ("PHI") is maintained during the pendency of these chapter 11 cases. If PHI was

inadvertently disclosed during these bankruptcy cases, the Debtors believe that they could become subject to significant civil and criminal penalties and fines as a result of breaching their legal obligations under HIPAA and other similar state and federal laws. The Debtors believe that the proposed Privacy Procedures set forth in the Patient Confidentiality Motion appropriately balances the need to maintain the confidentiality of PHI under HIPAA with the need for adequate disclosure under the Bankruptcy Code.

43.    I believe that the relief requested in the Patient Confidentiality Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will ensure that the PHI of the Debtors' customers is not inadvertently disclosed during the pendency of these chapter 11 cases, thereby subjecting the Debtors to substantial criminal and civil penalties and fines.  Accordingly, on behalf of the Debtors, I respectfully request that the Court enter an order granting the relief requested by the Patient Confidentiality Motion.